UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| LIBERTARIAN NATIONAL COMMITTEE, INC., THE LIBERTARIAN PARTY OF KENTUCKY and DAVID PATTERSON,  )<br>)<br>)<br>) | Civil No.: 14-63-GFVT |
| Plaintiffs,  )<br>) | **MEMORANDUM OPINION** |
| V.  )<br>) | **&**<br>**ORDER** |
| DR. TERRY HOLIDAY, ET AL.  )<br>) | |
| Defendants.  ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On October 13, 2014, Kentucky Educational Television (KET) will host United States Senate candidates Mitch McConnell, a Republican, and Alison Lundergan Grimes, a Democrat, on *Kentucky Tonight*, a public affairs program hosted by Bill Goodman. This event has been long anticipated by political enthusiasts and the campaigns alike. Now, David Patterson, the Libertarian Candidate for U.S. Senate, seeks to require KET to include him. Patterson alleges that the Defendants' decision to exclude him violates both his constitutional rights to free speech and due process and asks this Court to enjoin KET from doing so.[1] *Id.* For the reasons that follow, the constitution does not require that result.

---

[1] While the Libertarian National Committee, The Libertarian Party of Kentucky, and David Patterson are all Plaintiffs, for simplicity the Court refers only to Patterson. Similarly, because Patterson sues eleven individuals, in their official capacities as Commissioners of the Kentucky Department of Education, as Members of the Kentucky Authority for Educational Television, and in their respective leadership positions within KET, the Court refers to these Defendants in the collective as KET.

# I

After having reviewed all exhibits and filings, and heard testimony and argument at an October 9 hearing, the Court makes the following findings of fact. On January 22, 2014, Shae Hopkins, Executive Director of KET, sent an email to KET's legal counsel about the establishment of pre-selection criteria for use in determining which candidates would be invited to participate in *Kentucky Tonight* programming. [R. 19-1.] Hopkins explained that KET's purpose was "to follow the law, be fair to all concerned, protect and maintain KET's integrity and reputation for inclusion and fairness – and provide the best service to our viewers." [*Id*.] Later that month, Mike Brower, Senior Director of Production Operations for KET, emailed a draft version of such criteria to KET employees Bill Goodman, host of *Kentucky Tonight*, and Deidre Clark, the program's producer. [R. 19-4.] The draft criteria began, "KET decides who is invited to appear on its ... programs based on good faith journalistic judgment and on what we believe will best serve, and interest, our viewers." [R. 19-4 at 3.] A few days later, Brower emailed an updated copy of the criteria to KET staff. In the text of his email, he explained:

> We've tried to make this as broad as possible so we don't paint ourselves into a corner with language that ends up inadvertently disqualifying a marginal candidate who is also someone we want to include. Gatewood for example. So we didn't say you have to poll at a certain level or other qualifiers that would eliminate marginal but interesting candidates. ***Our goal here is to have a way to defend not including only the most extreme cases, like out of state crusaders, or wacky people*** who paid the $50 and got 2 names on a form to qualify as a candidate.

[R. 4-7 (emphasis added).] Brower then emailed KET's lawyer, seeking legal advice on how best to develop the above criteria. Brower explained that in 2012, there were "two out of state candidates who were not running serious campaigns but were rather using the process to air

2

antiabortion ads." [R. 4-8.] KET did not invite those candidates to the forum and the candidates did not protest. [*Id.*] Brower expressed concern, that in the current election there was "at least one eccentric candidate on the ballot [*sic*] who we would prefer not to invite." [*Id.*] He noted that, "[t]o address this we are drafting 'pre-established objective criteria' and would like you to advise on the wording." Brower concluded,"[w]e've made an attempt to give ourselves an out but not to be so specific as to corner ourselves and inadvertently exclude a marginal but potentially viable candidate." [R. 4-8.]

On February 4, in the midst of the primary season and with objective criteria in place, candidates in both the Democratic and Republican primaries were invited to participate in *Kentucky Tonight's* April 21 and April 28 programs, respectively. [R. 4-10.] The invitation also noted that general election candidates would be invited as guests on October 13. [*Id.*]

In a March 5 email to Hopkins, Brower explained that the "2014 Election Candidate Invitation Criteria" were devised to satisfy Federal Election Commission (FEC) requirements while also "giving KET the ability to NOT invite candidates who have only managed to get their names on a ballot [*sic*] but do not truly have a legitimate campaign underway." [R. 19-6 at 2.] These criteria, titled "Candidate Invitation Criteria 2014 Primary and General Elections," provided that a candidate would be invited to appear on "a KET public affairs program" only if they were a Kentucky resident and a legally qualified candidate under FCC guidelines and also satisfied one of four other conditions: (1) the candidate had made public position statements on political issues, (2) the candidate maintained an active website devoted to the campaign that addresses issues related to the race, (3) the candidate had accepted at least $10,000 in

3

contributions for the current election or (4) the candidate had received five percent or more of support for the current election in a professionally conducted and independent poll. [R. 19-6 at 3.] The criteria further provided that incumbents would be invited regardless of whether they satisfied the criteria. [*Id.*]

Shortly before the primary candidate televised programs, Patterson announced his candidacy for the U.S. Senate. [R. 4-12.] And just a few days before the first program, Goodman sent an email regarding write-in candidate Shawna Sterling's website to *Kentucky Tonight* producer, Deidre Clark. [R. 19-8.] Goodman wrote:

> I'm sure you're [*sic*] seen Shawna Sterling's website…I just took a look this morning for the first time! Saving baby cows? Angels and music led her to the U-S Senate race? What are your thoughts about asking her issue oriented questions or to explain the abundance of You Tube videos on cows and angels and working for Obama in 2012? And, just to be sure, we will have a policeman nearby Monday night?

Even so, Sterling was one of the candidates present as part of the first *Kentucky Tonight* forum on April 21. [R. 27 at 116.]

With the primary elections behind them, KET decided to revisit its candidate invitation criteria and began the process of developing new criteria, again in consultation with legal counsel, over the coming month. In anticipation of the general election, on May 22, as promised, KET invited both McConnell and Grimes to appear on the October 13 *Kentucky Tonight* program. [R. 4-19.] Later in the day, Brower distributed the updated criteria to many of KET's staff and leadership, explaining that it was important to get the criteria "on record today since this will eliminate the write in and other candidate from the forum." [R. 4-24.] He continued, "[i]t was agreed by the group yesterday that we should do that." [*Id.*]

4

After the invitations went out, KET wrestled with the details of the general election forums. For example, Tim Bischoff, Senior Director of Marketing, inquired as to whether Patterson and Ed Marksbury, an Independent candidate, would be included in the October 13 program. [R. 4-25; R. 19-16.] Goodman responded, explaining that neither Patteron nor Marksbury had been invited to the October 13 program but that they could potentially appear on a separate program. [*Id*.] Brower similarly responded, stating that Patterson and Marksbury "did not meet our criteria for invited candidates for the US Senate Race." [R. 19-17.]

Later, an email regarding plans for KET's Senate Race Coverage indicated that KET was "stiffening the criteria for invited guests for the general election programs (including KYTON and 1-2-1) to eliminate nonviable candidates and reduce the potential for an equal opportunity request." [R. 19-37 at 3.] And, KET staff also engaged in an email discussion about whether Robert Ransdell, a write-in candidate for the U.S. Senate, would be included in KET election programming.[2] [R. 4-27.] KET staff referred to Ransdell as a "nut" but then engaged in a conversation about whether he was eligible to participate in KET programming under the established criteria. [*Id*.]

By mid-June, KET finalized its new general election criteria. [R. 4-28; 19-21.] To appear, a candidate would have to demonstrate they met all four of the following criteria by August 15, 2014: (1) he/she is a Kentucky resident and a "legally qualified candidate" under FCC guidelines; (2) "The candidate or the candidate's campaign maintains an active website

---

2   Ransdell is running on an "extremely unpopular (and offensive) white supremacist platform." [R. 4-6 at 6.] During the hearing, it was noted that Ransdell's platform included the slogan, "With Jews We Lose."

devoted to the campaign that addresses at least three (3) issues related to the race in which the candidate is running"; (3) "The candidate has accepted at least $100,000 in contributions for the current election"; and (4) "If a professional public opinion survey by an independent political pollster has been conducted, the candidate must have received ten percent (10%) or more of support for the current election."[3] [R. 19-21 at 4.] A July 17 email from Brower confirms that these were the final criteria. [R. 19-21 at 2.]

Just a few days after this email, the Libertarian Party of Kentucky issued a press release announcing it was half-way to having enough signatures to qualify for a spot on the ballot. [R. 19-23.] KET announced, on July 23, that Senator McConnell and Secretary Grimes were the only candidates invited to the October 13 candidate forum. [R. 4-29; 19-24.] That press release also included the candidate criteria. [*Id*.] Also on the same day, Shawna Sterling was informed that she would not be invited as she did not meet the criteria. [R. 19-25.]

Less than a month later, Patterson received enough signatures to become an official candidate in the U.S. Senate race. [R. 16 at 4.] This prompted Ken Moellman, the Chair of the Libertarian Party of Kentucky, to inquire as to whether Patterson would be included "on the upcoming KET show for the US Senate candidates." [R. 19-29.] Clark responded, with the candidate criteria attached to her email, explaining that the only candidates who qualified were McConnell and Grimes. [*Id*.]

Patterson filed his Complaint with this Court on September 28 [R. 1], alleging that KET

---

3    An early draft of the criteria included a reference to twenty-five percent as the cutoff. That was changed to fifteen-percent. [R. 19-10.] After consultation with KET's legal counsel, this was dropped from fifteen to ten-percent. [R. 19-18; R. 19-21.]

6

has deprived him of his First Amendment rights to free speech and also of his Fourteenth Amendment rights to due process. [*Id*.] Pursuant to 42 U.S.C. § 1983, Patterson asks this Court to enjoin KET from enforcing its candidate invitation criteria and, ultimately, require KET to include Patterson in the October 13 *Kentucky Tonight* candidate forum. [R. 4-6.] The parties have briefed the issues [R. 4; 9; 24], and the Court conducted a hearing on October 9. The Court being fully apprised, and for the reasons stated herein, will DENY Plaintiffs' request that this Court enjoin KET from applying its criteria.

**II**

Preliminary Injunctions are issued pursuant to Federal Rule of Civil Procedure 65. The standard is well established. District courts must consider (1) whether there is a likelihood of success on the merits of the plaintiff's claim; (2) whether the plaintiff will suffer irreparable harm if the injunction is not granted; (3) whether others would be harmed by granting the injunction; and (4) whether the public good is served by issuing the injunction. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc)). "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Id.* (citing *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). With that said, "'[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'" *Jones v. Caruso*, 569 F.3d 258, 265-66 (6th Cir. 2009) (quoting *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998)). Said another way,

7

"'because the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is ... whether the [regulation] at issue is likely to be found constitutional.'" *Id*. (quoting *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998)); *see also Congregation Lubavitch v. City of Cincinnati,* 923 F.2d 458, 460 (6th Cir. 1991) (As harm could be suffered by either party, and because the public interest depended on the correct application of First Amendment principles, the court's decision turned on the likelihood of success on the merits.)  Finally, "[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000)).

### A

In *Arkansas Educ. Television Comm'n v. Forbes,* the Supreme Court considered whether a state-owned public television broadcaster "had a constitutional obligation to allow every candidate access" to a debate.  523 U.S. 666, 669 (1998).  The simple answer is no.  In that case, the Arkansas Educational Television Commission (AETC) hosted a series of debates between candidates for federal offices and invited the Republican and Democratic candidates to appear but chose not to invite an independent candidate, Ralph Forbes.  In denying Forbes an appearance, the Executive Director explained that the AETC had "made a bona fide journalistic judgment that our viewers would best be served by limiting the debate" to the candidates already invited.  *Id*. at 671.  The Supreme Court held that the AETC debate was a nonpublic forum "from

8

which AETC could exclude Forbes in the reasonable, viewpoint-neutral exercise of its journalistic discretion." *Id.* at 676. The Court found it was "beyond dispute that Forbes was excluded not because of his viewpoint but because he had generated no appreciable public interest. *Id*. at 683. The dispute presented in *Forbes* is very similar to the one before the Court and, in many ways, the Supreme Court's decision provides the parameters that govern this Court's analysis.

Before delving into the question of KET's motives, the first question that must be considered is whether *Kentucky Tonight's* candidate forum is a "public debate." This is important because public broadcasting is not normally scrutinized under the public forum doctrine but "candidate debates present the narrow exception to [that] rule." *Forbes*, 523 U.S. at 675. If the October 13 *Kentucky Tonight* candidate forum is not a "debate" then KET is provided broad deference in determining who appears but if it is a "debate" then it would be subject to greater scrutiny. *Id.* at 675. Furthermore, FEC regulations require that organizations hosting political debates employ "pre-established objective criteria to determine which candidates may participate in a debate." 11 C.F.R. § 110.13(c). The parties do not agree on whether it is a debate or merely a forum.[4] One thing is for sure, the October 13 program is a joint appearance. It is this characteristic that would seem to capture the greatest attention by the First Amendment.

---

[4] KET is adamant that they believe the candidate edition of *Kentucky Tonight* is a forum rather than a debate. The evidence cuts both ways. Emails from Josh Holmes, a McConnell campaign representative, referred to the appearance as a "debate" on numerous occasions. [R. 19-33.] Charly Norton, a representative from the Grimes campaign, emailed notice to KET that Grimes would not participate in the primary debate but that Grimes "looks forward to debating Sen. McConnell in the general election." [R. 4-15.] KET admits that the line between forum and debate "has not been crisply drawn." Neither party directs this Court to any legal authority that enables it to easily decide whether *Kentucky Tonight's* candidate forum is a debate.

And, in fact, KET's legal counsel seems to suggest such a distinction. [*See* R. 19-1.] Nevertheless, KET, out of an abundance of caution, established objective criteria which they then used when deciding who to invite. Hence, with criteria in place, the case will be evaluated under the debate framework.

In terms of First Amendment jurisprudence, a candidate debate that is produced by a public television station constitutes a "nonpublic forum." *Forbes*, 523 U.S. at 682. As such, restrictions on speech are constitutional "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). This means that KET may exclude a candidate because they believe he is not "serious" or has "no appreciable public interest." *Forbes*, 523 U.S. at 683. KET cannot, however, exclude Patterson from the debate "on the basis of whether it agrees with [his] views." *Id*. at 680. To permit such viewpoint discrimination, in the context of a debate, would "present not a '[c]alculated ris[k],' but an inevitability of skewing the electoral dialogue." *Id.* at 676 (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*, 412 U.S. 94, 123, 125 (1973)).

KET contends that Patterson was not invited to participate in the debate simply because he did not satisfy its objective candidate selection criteria. Patterson's chief complaint is not about what criteria KET employed but, rather, that the criteria "were, and are pre-textual."[5] [R.

---

5    Plaintiffs conceded in briefing that the criteria were objective. [*See* R. 24 at 6 ("There is no question but that KET adopted criteria – objective criteria in fact.")] For the first time, at the October 9 hearing, Plaintiffs took issue with the $100,000 requirement and also with the 10% polling requirement. While these are interesting questions, the legitimacy of these criteria is not presently at issue. Kentuckians will remember that Kentucky Congressman William Natcher (1909-1994), who served over forty-years in Congress, refused to ever accept campaign contributions. Under KET's present framework, Congressman Natcher would not

10

24 at 7.] Put another way, Patterson alleges that the criteria were adopted to "eliminate the wacky, the out of state crusaders, the most extreme cases, those with an anti-abortion platform, and the eccentric." [R. 24 at 7 (referring to R. 4-3, Exhibit A & B.)] "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 183 (1999) (When considering restrictions on "commercial" speech, "the Government bears the burden of identifying a substantial interest and justifying the challenged restriction."); *see also Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 571 (6th Cir. 2012) ("The governmental entity that enacts the regulation bears the burden of establishing each element of the analysis, and 'the Court ordinarily does not supply reasons the legislative body has not given.'")

**B**

In support of his pretext argument, Patterson has no direct evidence. This is not, however, surprising as "the government rarely flatly admits it is engaging in viewpoint discrimination." *Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny County*, 653 F.3d 290 (3d Cir. 2011) (quoting *Ridley v. Massachusetts Bay Transp. Authority,* 390 F.3d 65, 86 (1st Cir. 2004.) Instead, Patterson rests on circumstantial evidence. His overarching theory is that the debate criteria were developed, and then later changed, to preclude voices like his from participating. He argues that had KET not changed the original criteria, he would be eligible. [R. 4-6 at 8.] In further support of his pretext argument, Patterson contends that both

---

have been invited to appear on the candidate edition of *Kentucky Tonight*.

McConnell and Grimes, who were invited under the earlier criteria, were never re-evaluated to ensure that they qualify in light of the newer criteria, under which Patterson was rejected. Goodman, in his testimony, explained that McConnell and Grimes would assuredly qualify under either set of criteria but could not point to evidence showing that they had been evaluated under the newer general election criteria. But with that said, no argument was ever made that McConnell or Grimes would not actually qualify under the new criteria, nor could it be.

Patterson suggests that Brower's January 27 and 31 emails show that KET's efforts to adopt "pre-established criteria" were motivated by pretext. Recall that at the beginning of the year, before the primary, Brower expressed his desire not to "paint [KET] into a corner with language that ends up inadvertently disqualifying a marginal candidate who is also someone we want to include." [R. 4-7.] Patterson argues this statement, and the exchanges that followed, demonstrate KET's desire to eliminate these candidates and suggests that this desire to exclude the candidates is because KET disagrees with their viewpoint. To the extent that Patterson believes he was excluded "because his views were unpopular or out of the mainstream," he is mistaken. The Supreme Court confronted an identical argument in *Forbes* where it pointed out that this logic is flawed because "[a] candidate with unconventional views might well enjoy broad support by virtue of a compelling personality or an exemplary campaign organization." *Forbes*, 523 U.S. at 683. Had Patterson or anyone else with "wacky" views met KET's criteria, there is no evidence that they would not have been included.

Further, in Patterson's view, KET's reactions to candidates Shawna Sterling and Robert Ransdell further support the notion that KET was engaging in illegal viewpoint discrimination.

12

So, when Bill Goodman sent an email to his producer, Deidre Clark, in which he noted that Shawna Sterling's website included materials about saving baby cows and how angels and music had led her to the senate race, Patterson argues that this implies that Goodman was making "judgment calls," discriminating against those views. [R. 19-8.]

Goodman was questioned about this email extensively. Much emphasis was put on Goodman's punctuation usage—the suggestion being that his tone was sarcastic and dismissive of Sterling's views on cows and angels. Goodman vehemently denied that he was making any judgments about Sterling's viewpoints, but rather contends that he was asking for advice about what topics to cover during Sterling's *Kentucky Tonight* interview. [R. 19 at 5.] Even had Goodman been making light of Sterling's views, he certainly did not discriminate against her viewpoint, as is evidenced by the fact that she was permitted to appear on his program only three days after he made the allegedly disparaging remarks. [R. 27 at 116.]

Similarly, Patterson suggests that a June 10 and 11 KET email exchange about candidate Robert Ransdell, discussed *supra* at footnote 2, further demonstrates viewpoint discrimination. In the email, Renae Shaw, a colleague of Goodman's, referred to Ransdell as a "nut." [R. 4-27.] Bischoff responded, "[Ransdell's] knowledge of election law isn't as finely tuned as his racism." [*Id.*] While both of these comments demonstrate a dislike for Ransdell's white supremacist platform, when viewed in context of the entire email exchange it is apparent that they are nothing more than offhanded remarks in a greater discussion about whether KET was obligated, pursuant to its objective criteria, to include Ransdell in its programming. [*Id.*] KET was giving legitimate consideration to whether they were obligated to have Ransdell on the air. Nothing indicates

13

intent to exclude him based on viewpoint. This is consistent with Goodman's testimony given during the hearing that any candidate, including Robert Ransdell, would have been invited to the debate had they met the objective criteria.

But it is a May 22 email from Mike Brower that Patterson believes provides the strongest support for his pretext argument. This is the email in which Brower wrote, "I talked it over with Deidre who was most concerned that we get [the candidate criteria] on the record today since this will eliminate the write in and other candidate from the forum. It was agreed by the group yesterday that we should do that." [R. 4-24.] This email, suggests Patterson, "evidences a clear viewpoint based discriminatory intent on the part of Brower and KET, in changing the criteria to eliminate particular candidates and their views." [R. 24 at 4.] It is equally plausible, however, that Brower meant that the group had decided to begin applying the new general election criteria and that it was important to get that placed on the record because it would incidentally disqualify candidates.

Again, in one of the earliest emails in this case, Shae Hopkins explains that KET's intent in designing criteria is "to follow the law, be fair to all concerned, protect and maintain KET's integrity and reputation for inclusion and fairness – and provide the best service to our viewers." [R. 19-1.] Just a couple days later, Mike Brower emailed a draft version of such criteria to KET employees that began, "KET decides who is invited to appear on its ... programs based on good faith journalistic judgment and on what we believe will best serve, and interest, our viewers." [R. 19-4 at 3.]

Ultimately, Patterson cites to no direct evidence of viewpoint discrimination. Patterson, himself, explains that he has reviewed the materials received from KET pursuant to the open records request, 1,117 documents, and he admits that he did not see a single document wherein KET mentions his viewpoint. Ken Moellman, similarly, reviewed the documents "several times" yet "did not see anything that specifically said [KET] disagree[d] with a particular viewpoint." In fact, Moellman indicates that the only evidence referencing anything related to Patterson's viewpoint is a June 5 email which asks for confirmation that "we did not and will not invite David Patterson (Lib) and Ed Marksberry (Ind) to the Oct 13 program, because they did not meet our pre-established criteria." [*See* email referenced at 19-16.] This email does not suggest that Patterson was being discriminated against on the basis of his viewpoint. Rather, it simply identifies him as a Libertarian.

Bill Goodman testified that the tightening of criteria, or changing the rules after the primary, had nothing to do with excluding Patterson. He further testified that he had "no animus or bias" towards the viewpoints of either Patterson or Ed Marksberry, an Independent Candidate (Goodman noted that he had hosted Marksberry on his show a number of times). Goodman testified that the speculation that KET excluded Patterson due to viewpoint is simply untrue: "I can say unequivocally without any question that that has not occurred, it did not occur in this occasion and as far as I'm concerned while I am there, it will not be a reason to exclude someone from our programs." Goodman testified that any candidate, including Robert Ransdell, would have been invited to the debate had they met the objective criteria.

**C**

The Supreme Court has recognized that "principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint based." *Forbes*, 523 U.S. at 673. Public broadcasters may exercise their editorial discretion in choosing to exclude candidates from televised debates without violating the candidate's First Amendment rights. *See Forbes*, 523 U.S. 666 (1998) (Supreme Court's affirms decision not to include candidate when candidate's "own objective lack of support, not his platform, was the criterion."); *Chandler v. Georgia Pub. Telecommunications Comm'n*, 917 F.2d 486, 489 (11th Cir. 1990), cert. denied, 502 U.S. 816 (1991) (Finding no First Amendment viewpoint discrimination when Georgia Public Television "chose to air a debate between only the Democratic and Republican candidates because it believed such a debate would be of the most interest and benefit to the citizens of Georgia."); *Alabama Libertarian Party v. Alabama Public Television*, 227 F. Supp. 2d 1213, 1220 (N.D. Ala. 2002) (District Court found that five-percent threshold which excluded a libertarian candidate was content neutral, reasonable regulation that was aimed at ensuring meaningful debate); *see Marcus v. Iowa Public Television*, 150 F.3d 924 (8th Cir. 1998). This is exactly what has happened here, the application of principled exclusions.

Ultimately, the Court is convinced that KET's actions and discussions were aimed at excluding non-serious candidates, not viewpoints. This intention was made clear on June 9 when KET explained that they were "stiffening the criteria for invited guests for the general election programs…to eliminate nonviable candidates." [R. 19-37 at 3.] KET acted within the bounds of the First Amendment.

16

Patterson believes that it is enough that he is a thoughtful candidate, serious about his candidacy.  Without question voters may be better informed, or at least exposed to more viewpoints if he is included.  But the First Amendment is not a rule of quantity at any cost.  What the Supreme Court understands is that there are very good reasons, informed by the values of the First Amendment, to permit KET to limit the number of candidates at its debate.  Voters may actually benefit by a forum or debate that includes only those candidates that have a realistic chance of winning rather than many voices competing for very limited time.  What KET cannot do is pick and choose candidates based on their viewpoints.  KET has not done so here.  The fact that particular candidates were excluded as non-compliant with the objective criteria does not mean, *ipso facto,* that the criteria were designed to exclude those viewpoints.

Patterson's case rests largely on the emails referenced here as well as others.  When taken as a whole, the picture that emerges is of an institution trying to do the right thing.  Maybe the language of these electronic conversations was at times unartful.  Maybe the private thoughts of KET executives, now made public, have the feel of prejudging viewpoints.  But it cannot be said that these conversations, many early in a process that included careful consultation with legal counsel, constitute viewpoint discrimination.  On Monday night, *Kentucky Tonight* will be broadcast as planned. Kentuckians will have the benefit of hearing the views of the two major candidates.  And, no doubt, the positions of less-established candidates will also be heard this election season, albeit without the mandate of a government-funded forum.  Nothing about this circumstance weakens the First Amendment to the Constitution.

17

**III**

As Patterson's constitutional claims are unlikely to succeed on the merits[6], the Court need not consider the remaining factors that are normally considered prerequisite to the entry of injunctive relief. **Accordingly**, the Court being otherwise sufficiently advised, it is hereby **ORDERED** that the Plaintiffs' Motion for Injunctive Relief [R. 4] is **DENIED**.

This 11th day of October, 2014.



---

6    In his initial petition for relief, Patterson argues that KET was "required to promulgate their 'candidate forum' policies as administrative rules." [R. 4-6 at 14.] He further argues that he had a "protectable property interest in his participation in the October 13" debate since he had (1) qualified for the ballot, and, (2) met the March, 2014 criteria. [*Id.* at 16.] KET respondes to these due process arguments but Patterson chose not to address them again in either his Reply nor during the October 9 hearing. This is probably in recognition of the weakness of the arguments.

First, "[a]n administrative body shall not promulgate administrative regulations…[w]hen the administrative body is not authorized by statute to promulgate administrative regulations. Ky. Rev. Stat. Ann. § 13A.120 (West). KET argues that no statute presently grants KET the authority to promulgate administrative regulations. [R. 19 at 19.] KRS § 168.100, "Powers of authority" provides that KET "shall have and is hereby given all such constitutional powers as are necessary to its accomplishment of the purpose and implementation of the public policy set forth in KRS 168.010." Ky. Rev. Stat. Ann. § 168.100 (West). Nowhere, however, are they given the power to promulgate regulations. As pointed out by KET, other entities that do have the power to promulgate are given such by explicit order. [See R. 19 at 19-20.] KET explains that the "only time the General Assembly has *ever* vested KET with the power to promulgate administrative regulations was in the now-repealed KRS 121A.100." [R. 19 at 20 (emphasis in original).] KRS § 121A.100, which was part of the Public Financing Campaign Act, was repealed in 2005 and any statutory grant of power that it did delegate at that time has long since ceased to exist.

Second, Patterson cites no persuasive legal authority to demonstrate to this Court his basis for claiming that he may possess a protectable property interest in his invitation as a guest.

18