UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| LIBERTARIAN NATIONAL COMMITTEE, INC., et al., | ) ) ) | Civil No.: 3:14-cv-00063-GFVT |
| Plaintiff, | ) ) | |
| v. | ) ) | **MEMORANDUM OPINION** |
| DR. TERRY HOLIDAY, et al., | ) ) | **&** **ORDER** |
| Defendants. | ) ) ) | |

*** *** *** ***

This matter is before the Court on the Motion for Summary Judgment [R. 73] filed by Dr.

Terry Holiday.  For the reasons stated below, this Court finds there was no First Amendment

violation and Defendants are protected by qualified immunity.  Accordingly, the Court

**GRANTS** the Defendants' request for summary judgment.

**I**

**A**

This case has been pending for over three (3) years, so a detailed analysis of the

procedural posture of this case necessarily follows.  In October 2014, Kentucky Educational

Television ("KET") hosted the only statewide, televised debate between the two major party

candidates for Kentucky's United States Senate seat: Mitch McConnell, a Republican, and

Alison Lundergan Grimes, a Democrat.  Two weeks before the debate, Plaintiffs Libertarian

National Committee, Inc., the Libertarian Party of Kentucky, and David Patterson—then a

senatorial candidate representing the Libertarian Party—asked the Court to issue a preliminary

injunction requiring KET to include Patterson in the broadcast, insisting that his exclusion would

"deprive Plaintiffs of their First Amendment rights."  [R. 4-6 at 9.]  In particular, the Plaintiffs

alleged that KET's decision to exclude Patterson demonstrated "a clear viewpoint based discriminatory intent." [R. 4-6 at 6.] On October 11, 2014, following an extensive evidentiary hearing, this Court denied the Plaintiffs' motion. [R. 28.] Upon thorough review of the record, the Court concluded that "KET's actions and discussions were aimed at excluding non-serious candidates, not viewpoints," and thus the network's decision to exclude Patterson landed squarely "within the bounds of the First Amendment." [*Id*. at 16.]

In July 2015, the Plaintiffs filed a second suit arising out of the same controversy, but this time they chose a somewhat different tactic—in addition to suing KET's employees in their official capacities, the Plaintiffs also advanced "individual money damage claims" against KET employees pursuant to 42 U.S.C. § 1983. [R. 44 at 2.] The Court subsequently consolidated that new suit with the old one, and all of the claims against the Defendants—in both their official and individual capacities—were incorporated into the Plaintiffs' amended complaint. [R. 41.]

The Defendants thereafter filed a Motion for Partial Dismissal on the Pleadings. [R. 42-1 at 2.] In it, they asked the Court "to dismiss the new defendants and amended claims and finally adjudicate this case's original, and remaining, pretext and procedural due process claims against the official-capacity defendants." [*Id*. at 26.] Specifically, the Defendants sought dismissal of the Plaintiffs' (1) new claims against five of the Defendants in their individual capacities, (2) allegation that "KET's $100,000 contribution criteria was *ipso facto* unconstitutional," (3) claim that the Defendants' August 15, 2014 deadline for meeting the debate invitation criteria violated Patterson's constitutional rights, and (4) argument that KET's invitation criteria violated the Equal Protection Clause. [*Id.* at 26-27.]

This Court granted partial dismissal on February 5, 2016, granting Defendants' motion to dismiss the Plaintiffs' claims against Defendant Bill Goodman in his individual capacity;

denying Defendants' motion to dismiss the Plaintiffs' claims against Defendants Hopkins, Clark,

Bischoff, and Brower in their individual capacities; and granting summary judgment in favor of

the Defendants with respect to the Plaintiffs' claims regarding (1) the $100,000 invitation

criteria, (2) the August 15, 2014 filing deadline, and (3) alleged violations of the Equal

Protection Clause.[1]  [R. 47 at 22.]  Limited discovery as allowed to conduct depositions on

Defendants Shae Hopkins, Deidra Clark, Timothy Bischoff, and Mike Brower.  [*See id.*]

On October 14, 2016, Defendants filed a Motion for Summary Judgment, which is

currently before the Court.  [R. 73.]  On the same day, Plaintiffs filed a Motion to Reconsider the

Defendants' Motion to Dismiss and/or in the alternative to amend their Complaint.  [R. 83.]

This Court denied Plaintiffs' Motion to Reconsider the Defendants' Motion to Dismiss and/or in

the alternative to amend their Complaint on September 11, 2017, [R. 98] and now turns to the

Motion for Summary Judgment.

**B**

KET has historically invited "any and all candidates who qualified" to be on a ballot to

appear in their debates.  [R. 73-1 at 2.]  KET first considered changing the debate criteria in 2010

and reached out to attorney Todd Gray for advice on how to proceed.  [R. 78-1 at 3; R. 73-6.]

Deidre Clark stated in her deposition that the reason KET decided to change their debate criteria

was to better service the interests of their viewers.  [R. 73-3 at 4.]  Mike Brower testified to the

same [R. 73-4 at 6] and Shae Hopkins emailed the same sentiments to Todd Gray in 2010.  [R.

---

[1] Plaintiffs confusingly state that this Court has not ruled on their Procedural Due Process
Claims, despite the explicit ruling by this Court granting **"**summary judgment in favor of the
Defendants with respect to the Plaintiffs' claims regarding . . . alleged violations of the Equal
Protection Clause."  [R. 47 at 22.]

73-6.] However, KET did not move at that time to change the criteria to appear on debates on their station.

In 2014, KET decided to implement criteria to determine who would be included on the *Kentucky Tonight* candidate debates and programs. [R. 73-1 at 4.] Executive Director Shae Hopkins delegated this task to Mike Brower, KET's Senior Director for Production Operations, and he worked with Bill Goodman, the host and managing editor of *Kentucky Tonight*, and Dedire Clark, the show's producer. [R. 73-1 at 5.] Brower again reached out to Todd Gray for advice on how to proceed. He sent an email to Todd Gray with proposed criteria on January 31, 2014, and indicated there was an "eccentric candidate on the ballet who we would prefer to not invite," and also indicated the guidelines they came up with were somewhat fluid to not "inadvertently exclude a marginal but potentially viable candidate." [R. 73-6 at 3.] The Libertarians point to a dictionary definition of eccentric as "a candidate having unusual viewpoints." [R.87 at 4.] The eccentric candidate KET sought to exclude was perhaps Burrell Farnsley, who Brower testified had on occasion been verbally abusive and physically violent at public political events, Shawna Sterling, or Geoffrey Young. [R. 76 at 25, 26.] Gray responded and sent his own proposed criteria for the debates. [R. 73-6 at 4.] The suggested criteria were that a candidate be: (1) legally qualified; and (2) meet three of the four following criteria: a) have a public position statements on three issues, b) have accepted at least $10,000 in contributions, c) have received more than incidental press coverage, d) have received 5% or more of support in a survey. [R. 73-6 at 4.] KET accepted Gray's suggested changes, but changed the second criteria to, "meet one [rather than three] of the four following criteria." [R. 73-1 at 6.]

Subsequently, Deidre Clark applied the new criteria and sent invitations to the *Kentucky Tonight* programs covering the 2014 Primaries for U.S. Senate. [R. 73-1 at 6.] She invited all

the Republican candidates to a program on April 21, 2014, and all the Democratic candidates to a program on April 28, 2014, and indicated that U.S. Senate general election candidates would be invited to the October 13, 2014, program. [R. 73-11 at 2.] The frontrunners in this election did not participate, but Shawna Sterling did attend, whose "website indicated that one of her goals as a Senator would be to save baby cows, and that angels and music led her to the Senate race." [R. 73-1 at 7; R. 73-12 at 2.]

After the Primary Election programs and after McConnell and Grimes won their respective primary elections on May 20, 2014, Brower, Clark, and Goodman met again with the intention to "tighten the criteria for the general election" program. [R. 73-1 at 7.] Clark explained they changed the criteria due to the differences between a primary and a general election, that a "lower bar" of admission to the program would be appropriate in a primary. [R. 73-3 at 15.] She explained that primary fields are more crowded and candidates might have a more difficult time securing high donations or reaching higher polling percentages. [R. 73-3 at 15.] Brower also confirmed that they tightened the criteria to "eliminate nonserious and/or nonviable candidates from participation." [R. 73-4 at 4.] On May 21, 2014, Shae Hopkins issued public invitations to Senator McConnell and Secretary Grimes to appear together on *Kentucky Tonight*. [R. 73-1 at 8.] The Libertarians take issue with the fact that KET was very focused on inviting McConnell and Grimes to the *Kentucky Tonight* program. They state, "Sen. McConnell and Sec. Grimes were the focus of KET's efforts, to the exclusion of every other candidate . . ." [R. 87 at 9.] They cite to an email from Bishoff to Clark, Brower, and Goodman, sent on June 5, 2017, that said, "Please confirm, we did not and will not invite David Patterson (Lib) and Ed Marksberry (Ind) to the October 13th program because they did not meet our pre-established criteria." [R. 79 at 30; R. 75-16.] Bill Goodman responded, "[w]e didn't include

5

them in the invitation for the October program; it leaves open including other candidates on the ballot to appear in a separate program . . ."  [R. 75-16.]

The next morning, KET changed the criteria to be included in the October 2014 *Kentucky Tonight* program, requiring that the candidate: (1) "be legally qualified"; (2) "have a website addressing political issues"; (3) have "accepted $100,000 in contributions"; and (4) have "received fifteen percent (15%) or more of support in an independent poll—the same polling number generally used to determine fields in presidential general election debates."  [R. 73-1 at 8.]  On June 5, 2014, Secretary Grimes agreed to appear on the October 13, 2014, episode of *Kentucky Tonight*.  [R. 73-1 at 9.]

On June 16, 2014, KET spoke with its lawyer and followed his advice to reduce the polling requirement from 15% to 10%.  [R. 73-3 at 19.]  Deidre Clark testified that she chose 10% because she looked at past polling and noticed that at least one third party candidate has achieved 10% of the vote.  [R. 73-3 at 19.]  The Libertarians focus on the fact that Clark looked at the "2006 Davis/Lucas/Houillion Congressional race," where the Libertarian candidate Houillion polled at 4.9%.  [R. 87 at 15.]   KET also set August 15, 2014, as the deadline for candidates to meet the criteria, as it was after the deadline for ballot access and comported with internal deadlines to publish *Visions*, KET's magazine received by its viewers.  [R. 73-1 at 9.]  The corrected guidelines were finalized on July 22, 2014.  [*See* R. 73-33.]  KET sent out these criteria to two candidates who had contacted them that they would like to participate in the October 13, 2014, program: Shawna Sterling and Robert Randsdell.  [R. 73-36; R. 73-37.]  KET did not contact Patterson to inform him of the criteria.  [*See* R. 87 at 17.]

David Patterson qualified for the 2014 U.S. Senate ballot with the required 5,000 signatures.  [R. 73-1 at 11.]  Patterson met the first criteria to appear on *Kentucky Tonight* as a

legally qualified candidate and also had a website, meeting the second criteria. [R. 73-1 at 12.]

It is undisputed, however, that he did not meet the $100,000 contribution threshold nor the 10%

polling threshold. [R. 73-1 at 12.] Patterson in fact raised $0 in the entire 2014 U.S. Senate race.

[R. 73-39 at 3.]

Senator McConnell accepted the invitation to appear on the *Kentucky Tonight* program on

August 18, 2014. [R. 73-41.] In an email to Bill Goodman accepting the invitation,

McConnell's campaign clarified that it was their understanding only Senator McConnell and

Secretary Grimes would appear on the debate. [R. 73-41 at 4.] On August 18, 2014, Bill

Goodman clarified that only McConnell and Grimes had been invited. [R. 73-41 at 3.]

The Libertarians emphasize two additional emails to support their claims. They point to

an email from KET board member Donna Moore Campbell to Shae Hopkins and Bill Goodman

which read, "So pleased to hear the news about October 13! Another validation that KET will

offer an unbiased program and will be fair to each candidate. Wish there was no Libertarian

candidate!" [R. 75-164.] Bill Goodman responded, "Thank you." [R. 75-171.] Shae Hopkins

responded in relevant part, "I don't believe that the Libertarian candidate meets our minimum

criteria to be included. It will just be McConnell and Grimes, which we believe is the best

service for our viewers." [R. 75-174.] Finally, the Libertarians take issue with an email where

Bill Goodman stated, "should I take the 5th?"[2] in an email to a friend. [R. 87 at 19.]

**C**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[2] The Libertarians did not provide a full citation to this email and the Court is unable to find this
exact email, but both parties reference the same text.

to judgment as a matter of law." Fed. R. Civ. P. 56.  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff."  *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp*., 477 U.S. at 325.  Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial.  Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324).  Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact.  It must present significant probative evidence in support of its opposition to the motion for summary judgment."  *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255).  However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).  Rather, "the nonmoving party

has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

## II

The Defendants have invoked the doctrine of qualified immunity for alleged violations of the First Amendment. When invoked, qualified immunity protects federal and state officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Occupy Nashville v. Haslam*, 769 F.3d 434, 441-46 (6th Cir. 2014) (granting qualified immunity to state officials on the plaintiff's federal constitutional claims).[3]

In evaluating claims of qualified immunity, courts apply a two-step analysis. First, the court asks if the "officer's conduct violated a constitutional right" when the facts are "[t]aken in a light most favorable" to the Plaintiffs. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court asks whether the violated right at issue was "clearly established." *Id.* For a right to be clearly established, it is important that "state of the law at the time of the action . . . gave respondents fair warning that their alleged treatment of the plaintiff was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (internal brackets omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," but "both [steps] must be answered in the affirmative for the plaintiff's claim to proceed." *Pearson*,

---

[3] Ky. Rev. Stat. Ann. § 168.030 (West) established Kentucky Educational Television as "[a]n independent agency and instrumentality of the Commonwealth," and Defendants have confirmed that they are employees of the Commonwealth of Kentucky and, therefore, "public officials." [R. 42-1 at 4.]

555 U.S. at 236; *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Once a

defendant has raised the defense, "the burden shifts to the plaintiff, who must demonstrate both

that the official violated a constitutional or statutory right, and that the right was so clearly

established at the time of the alleged violation 'that every reasonable official would have

understood that what he [was] doing violate[d] that right.'" *Thomas v. Plummer*, 489 F. App'x

116, 119 (6th Cir.2012). For a right to be clearly established, the exact factual situation need not

be outlined in case law, but "its contours must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739

(2002) (internal quotation marks omitted). This Court begins its analysis by analyzing whether

the Defendants' actions violated a Constitutional right.

"Public and private broadcasters alike are not only permitted, but indeed required, to

exercise substantial editorial discretion in the selection and presentation of their programming."

*Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673 (1998); *see also Columbia*

*Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 105, (1973),

(holding television broadcasters enjoy wide "journalistic freedom) Relevant for this

determination, the Supreme Court has recognized the importance of candidate debates in the

electoral process, "so that the electorate may intelligently evaluate the candidates' personal

qualities and their positions on vital public issues before choosing among them on election day."

*Forbes*, 523 U.S. at 675.

When broadcasters engage in "editorial discretion," however, they engage in speech

activity. *Id*. The Government "may not regulate speech based on its substantive content or the

message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828

(1995). But, "[n]othing in the Constitution requires the Government freely to grant access to all

10

who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). "[T]he First Amendment of its own force does not compel public broadcasters to allow third parties access to their programming." *Forbes*, 523 U.S. at 675.

The Supreme Court has recognized three different forums where the Government may restrict speech to varying degrees: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius*, 473 U.S. at 802. No analysis as to what type of fora is in question here, as the Supreme Court has conclusively held that a candidate debate on a state-owned public television broadcaster is a "nonpublic fora" for First Amendment analysis purposes. *Forbes*, 523 U.S. at 669.

The Government's restriction on "access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983) ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity.") Reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. The restriction doesn't need to be the "most reasonable" or the "only reasonable" option, it simply needs to be "reasonable." *Cornelius*, 473 U.S. at 808.

Because the October 2014 debate is considered a nonpublic forum, this Court only needs to determine if the Defendants' actions were reasonable given all the circumstances. Throughout the email and verbal communication and various depositions, the Defendants repeatedly state

11

that they were restricting access to the debate because they were trying to give their viewers the best possible viewing experience.  They implemented criteria for their *Kentucky Tonight* program to ensure only the most serious candidates appeared on their show, which was reasonable.

Patterson takes offense that KET was primarily focused on Grimes and McConnell when putting together the October 2014 show, but that was an entirely reasonable editorial decision for KET to make, as the two candidates were far and away the leaders in the U.S. Senate election, gaining significant national attention.  And First Amendment law explicitly allows "speaker identity" to play a part in restricting speech access in nonpublic fora.  *Cornelius*, 473 U.S. at 806. Though it's not clear who specifically KET sought to not include in its October 2014 *Kentucky Tonight* program, they are allowed that discretion as broadcasters who are regulating speech in a nonpublic forum.  Patterson had no First Amendment right to appear on KET in October 2014 then or now.

It was reasonable for KET to change their criteria after the primary election program, as general elections are inherently different than primary elections and a higher percentage in polls is a reasonable expectation for someone to appear with the frontrunners of a U.S. Senate campaign.  Clark and Brower confirmed their reasoning for tightening the criteria in their depositions.  [R. 73-3 at 15; R. 73-4 at 4.]

The Libertarians fight against the 10% polling requirement, asking this Court to make assumptions as to why KET chose 10% instead of 5%, pointing to the 2006 congressional race, where a Libertarian gained 4.9% of the vote.  They seem to ignore, however, that, even if KET had made the requirement 5% polling rather than 10% polling, Patterson did not raise a single dollar in his campaign for U.S. Senate and would not have qualified for the program even KET

12

had set the polling requirement at 5% and he polled at 5%. Even if KET had changed its

fundraising requirement to $10,000 or $5,000 or $1, Patterson would not have qualified to appear

on their program. The restrictions need not be the most reasonable restriction available, the

restrictions need only be, simply, reasonable. Expecting a candidate to poll at 10% in a major

race for the U.S. Senate after looking at past elections where a third party candidate had polled at

10% was reasonable. [R. 73-3 at 19.]

The Libertarians point to several emails from Defendants as proof they engaged in

viewpoint discrimination. The emails say nothing of the sort. In one email, Shae Hopkins

responded in relevant part, "I don't believe that the Libertarian candidate meets our minimum

criteria to be included. It will just be McConnell and Grimes, which we believe is the best

service for our viewers." [R. 75-174.] These reasons for excluding "the Libertarian" were

reasonable, that he didn't meet the criteria and that it best served the viewers to have only

McConnell and Grimes. Bill Goodman's email, in which he stated, "should I take the 5th?", is

also not relevant, as Bill Goodman did not in fact plead the fifth amendment to be silent. He was

deposed on October 8, 2014, from 8:43 a.m. until 2:52 p.m. and again on August 17, 2016, from

8:45 a.m. until 5:45 p.m. [*See* R. 27; R. 75.]

This Court finds *Forbes* the most helpful for the instant case. In *Forbes*, a state-owned

public television broadcaster hosted a "series of debates between candidates for federal office"

and "decided to limit participation in the debates to the major party candidates or any other

candidate who had strong popular support." 523 U.S. at 670. Forbes was an independent

candidate who was certified to run for office by gaining 2,000 signatures and who sought to be

included in the debates. *Id*. The Executive Director of the television broadcaster informed

Forbes that the station has "made a bona fide journalistic judgement that our viewers would best

be served by limiting the debate to the candidates already invited." *Id.* (internal quotations omitted). With various examples, the main reason Forbes was excluded from the debate was that he had "no appreciable public interest." *Forbes*, 523 U.S. at 682. In *Forbes*, Forbes was not invited to a debate simply because of who he was and that he had no appreciable public interest. In contrast to the current case, there was no written criterion Forbes did not satisfy, Forbes was merely excluded because of who he was as a candidate. The *Forbes* Court upheld a much looser and objectively lower standard than the current case.

Plaintiffs compare First Amendment violations from *Carey v. Wolnitzek*, 614 F.3d 189, 198–99 (6th Cir. 2010). There, the Sixth Circuit held that some restrictions placed on judges running for office violated the First Amendment. The canons in question prevented "candidates from speaking about some subjects (judicial philosophy, the legal issues of the day, party affiliation) but not others (experience); and the[] candidates from asking for support in some ways (campaign funds) but not others (a vote, yard signs)." *Id.* Though similar to this case in that it involved speech related to elections, the scope was different. The actual speech of judicial candidates was restricted each day wherever those candidates were and the parties agreed that strict scrutiny applied. *Id.* The court in *Carey* did not hold that judicial officers could speak on whatever topic in whatever forum existed in the world, but that they could not be restricted from speaking in general. In contrast, a debate on a publicly owned broadcaster is a nonpublic forum and this Court must only find that the restriction on speech be reasonable, which it is here.

Plaintiffs also rely on *Denver Area Educ. Telcoms. Consortium v. FCC*, 518 U.S. 727, 770. They claim this case held that "engaging in discriminatory conduct towards one political party by a broadcaster would not be constitutional." [R. 87 at 29.] Plaintiffs blatantly misstate this case, as the holding was in relation to Congress's attempt to regulate sexually explicit

content on certain types of broadcast channels.  To the extent this case is helpful, it is only in that it speaks generally of First Amendment law. The cases cited herein and in Defendants' briefing are more relevant and helpful in this Court's determinations.

Because Defendants' restrictions to the nonpublic forum debate they hosted were reasonable given all the circumstances, Defendants did not violate any clearly established Constitutional right.  Since both factors of the qualified immunity test must be answered in the affirmative for Plaintiffs' claims to succeed, and the first factor has not been met, the Defendants are protected by qualified immunity and Plaintiffs' claims against them fail.

**III**

For the foregoing reasons and being otherwise sufficiently advised, the Court hereby **ORDERS** that the Defendants' motion for summary judgment [R. 73] is **GRANTED**.  Judgment in favor of Defendants shall be entered contemporaneously herewith.

This the 29th day of September, 2017.

Gregory F. Van Tatenhove
United States District Judge